## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAYDHEALTH, LLC,** | : | |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 24-259** |
| | : | |
| **DAWN G. HOLCOMBE, doing business** | : | |
| **as DGH Consulting,** | : | |
| *Defendant*. | : | |

### MEMORANDUM

**KENNEY, J.**                                                **November 4, 2025**

In this defamation action, Plaintiff Paydhealth, LLC ("Plaintiff," "Paydhealth," or the "Company"), alleges one claim of defamation *per se* against Dawn G. Holcombe ("Defendant" or "Ms. Holcombe") for statements made at a 2023 pharmaceutical industry conference in Philadelphia, Pennsylvania, and for the republication of such statements in a February 2024 online article. Discovery is now complete, and Ms. Holcombe moves for summary judgment as to Paydhealth's claim of defamation *per se*. ECF No. 93. Paydhealth has also filed its own partial motion for summary judgment, *see* ECF No. 94, and a motion to exclude Ms. Holcombe's expert testimony, *see* ECF No. 92.

Upon consideration of all relevant filings (ECF Nos. 92–103), the docket, and the undisputed factual record before the Court, for the reasons set forth below, Ms. Holcombe's Motion (ECF No. 93) is **GRANTED** in full**,** and Paydhealth's Partial Motion for Summary Judgment (ECF No. 94) and *Daubert* Motion (ECF No. 92) are **DENIED** as moot.[1] An appropriate order will follow.

---

[1] "[A] District Court should consider cross-motions for summary judgment separately and apply the appropriate burden of production to each motion." *Beenick v. LeFebvre*, 684 F. App'x 200,

I.    **FACTUAL BACKGROUND**[2]

The facts of the case are largely straightforward. Paydhealth is a Texas Limited Liability Company wholly owned by Desert Shore Capital Partners and based in Dallas, Texas. ECF No. 95 ("Plaintiff's Stipulated Facts" or "PSF") ¶¶ 1–2. The owners of Desert Shore Capital Partners, including Dr. David Galardi ("Dr. Galardi"), the Company's Chief Commercial Officer, and Dr. Mark Strollo ("Dr. Strollo"), the Company's Chief Operating Officer, founded Paydhealth in 2019. *Id.* ¶ 3; ECF No. 93-2 ("Defendant's Stipulated Facts" or "DSF") ¶¶ 12, 24. The Company's Chief Legal Officer, Talcott J. Franklin, joined Paydhealth on October 1, 2023, after previously serving as Plaintiff's counsel both pro bono and on an hourly basis. PSF ¶ 4.

Dawn Holcombe is a 67-year-old resident of Connecticut who serves as the Editor-and-Chief of *Oncology Practice Management* and President of DGH Consulting. DSF ¶¶ 1–3. As part of her work with *Oncology Practice Management*, Ms. Holcombe "regularly publishes articles related to the healthcare industry." *Id.* ¶ 2. Ms. Holcombe's work with DGH Consulting involves providing "consulting and speaking services to practices, pharma, and payers in strategy development, MD/payer negotiations and relationships, and oncology management and pathways." *Id.* ¶ 3.

---

205 (3d Cir. 2017) (citing *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008)). A District Court will not "violate this rule" when it addresses the defendant's "motion for summary judgment first," rather than "consider[ing] the cross-motions simultaneously." *Id.* Because the Court considers Ms. Holcombe's motion for summary judgment first and—construing all material facts in favor of Paydhealth, the non-movant—finds that Defendant is entitled to summary judgment on Plaintiff's claim for defamation per se, "any need to consider [Paydhealth's] cross-motion for partial summary judgment" is mooted. *Id.* at 205–06. Further, the question of whether Dawn Holcombe satisfies the *Daubert* standard, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to qualify as an expert is now moot.

[2] The facts are largely drawn from the parties' stipulated fact submissions (ECF Nos. 93-2, 95) and the exhibits cited therein.

A.    **Paydhealth's AFP Categorization and the Company's Response: 2022–2023**

Paydhealth is sometimes referred to as an "alternative funding provider" or "AFP," a categorization used to describe Patient Assistance Programs ("PAPs") "that provide funding for patients who cannot afford very expensive prescription drugs," as well as entities "that provide services to help patients gain access to funding from PAPs or other sources of funds." *Id.* ¶¶ 19, 28. Members of the health care industry publicly categorized Plaintiff as an AFP in online articles in 2022 and 2023. *Id.* ¶¶ 29, 40; ECF No. 93-4 at 152, 169.

With Paydhealth's AFP characterization came negative press. For example, on August 2, 2022, Dr. Galardi received an email from an outside pharmacist requesting comment on an article written by Adam Fein, Ph.D., titled "The Shady Business of Specialty Carve-Outs, a.k.a., Alternative Funding Programs." DSF ¶ 29. The article, which purported to discuss the "scheme" of "specialty carve outs, also known as alternative funding programs (AFP)," explained that "[s]ome or all specialty drugs are administered by a secretive third-party vendor that is separate from the commercial plan's PBM," and listed Paydhealth as one such "third-party vendor." ECF No. 93-4 at 153. The article later stated that the "third-party vendor helps the patient disguise themselves as 'uninsured' so they can apply for the manufacturer's PAP funds to cover the cost of the prescriptions," and is estimated to "retain up to 20% to 25% of a drug's full list price, i.e., the value of charitable funds provided to the patient." *Id.* When asked about the article in his deposition, Dr. Galardi described it as "obviously quite pejorative about AFPs," and noted that "it specifically mention[ed] Paydhealth as an AFP." DSF ¶ 30.

In June 2023, Dr. Galardi received another email "referr[ing] to an article about a federal court lawsuit by the pharmaceutical company . . . AbbVie against an AFP by the name of Payer Matrix." DSF ¶ 35.  The article referred to AbbVie's previous decision to update its

> patient assistance program application to include the following comments: Patients with insurance plans or employers participating in an alternate funding program (also sometimes referred to as patient advocacy programs, specialty networks, SHARx, Paydhealth, or Payer Matrix, among other names) requiring them to apply to a manufacturer's patient assistance program or otherwise pursue specialty drug prescription coverage through an alternate funding vendor as a condition of, requirement for, or prerequisite to coverage of relevant AbbVie products, or that otherwise denies, restricts, eliminates, delays, alters, or withholds any insurance benefits or coverage contingent upon application to, or denial of eligibility for, specialty drug prescription coverage through the alternate funding program are not eligible for the myAbbVie Assist program.

*Id.* ¶ 36.

### B.    October 2, 2023 Conference ("October 2023 Conference")

Against this backdrop, Ms. Holcombe gave her presentation on AFPs.  On October 2, 2023, Ms. Holcombe gave "a three-hour presentation and 'workshop'" titled "Understand the Nuances and Impact of Alternate Funding Programs" at the *Copay, Reimbursement and Access Congress* conference in Philadelphia, Pennsylvania, hosted by Informa Connect.  DSF ¶ 4; PSF ¶¶ 10–11. A slide deck, which discussed AFPs generally and individual service providers labeled as AFPs, accompanied her oral presentation.  PSF ¶ 13a; ECF No. 96-1 at 124.  Prior to the Conference, Informa Connect alerted Ms. Holcombe that "stakeholders" were present in the audience.  PSF ¶ 10.  Dr. Strollo was also present, attending as a partner of Desert Shore Capital Partners, LLC. DSF ¶¶ 13–14.

While Ms. Holcombe discussed various entities she classified as "Third Party Vendors" during her presentation, she most notably presented nine slides regarding Paydhealth specifically. ECF No. 96-1 at 146, 151–59.  Ms. Holcombe's Paydhealth-related slides primarily depicted (1)

a description of Paydhealth's business model and client messaging, (2) a list of prescription drugs, labeled on the slides as "PaydHealth Select Drugs and Products$^{SM}$ List 1/1/22," which she referred to verbally as a "non-essential health benefit list," and (3) excerpts from a Paydhealth contract with a Tennessee entity.  *Id.*; PSF ¶ 13b.

Paydhealth claims that, during the presentation, Ms. Holcombe made the following defamatory statements regarding Paydhealth:[3]

- **Statement #1**: "Holcombe told the live and online audiences that Paydhealth misclassified hundreds of drugs as 'non-essential' and deliberately 'fooled' PAPs into approving aid requests.  She also asserted that Paydhealth usurped from prescribing physicians 'final authority over the prescribed products and drugs' patients receive and that 'these companies' like Paydhealth will compromise patient safety by 'deliver[ing] the drugs to your home or your office' instead of allowing doctors to administer them." ¶ 1.

- **Statement #2**: "She said next: These folks are absolutely promising: No more copays for qualifying employees, and we will deliver the drugs to your home or your office.  They're doing both, brown bagging and white bagging.

  - Holcombe explained that 'this is a very, very important issue' because 'brown bagging and white bagging' make doctors 'very worried about . . . patients receiving drugs from a source' the doctors do not 'trust.'  She added that 'most of these [drugs] are toxic,' making 'stability and handling' of the drugs 'very important.'" ¶ 33.

- **Statement #3**: "She claimed, falsely, that Paydhealth has a 'non-essential health benefit list' that includes up to '500 drugs,' which she described as 'pervasive'." ¶ 34.

- **Statement #4**: "Further on in her presentation, Holcombe asserted that Paydhealth disappoints its healthcare plan clients 'because they don't get a choice' about whether Paydhealth provides advocacy services for their plans' participants.  The 'health plan sometimes isn't happy,' she claimed, since the plan 'built their risk profile on having all the services.'" ¶ 36.

---

[3] The statements are quoted verbatim from an email from Plaintiff's counsel dated November 26, 2024, later repeated in Plaintiff's Fourth Supplemental Response to Defendant's Second Set of Interrogatories, and cite directly to the Amended Complaint.  *See* DSF ¶ 8 & n.1; *see also* ECF No. 93-3 at 215–16; ECF No. 96-3 at 92–106.

- **Statement #5**: "Holcombe next accused Paydhealth of sometimes overriding the doctor's 'final authority over the prescribed products and drugs.' Showing a slide quoting language in Paydhealth's contract, she said (with emphasis added):

  o They did say the customer acknowledges that the doctor has final authority over the prescribed products and drugs. This is not always the case. Sometimes they'll come in with an alternative drug that they suggest, and it's one that they have found a more favorable or more amenable or more easily fooled assistance program. And so they say, well, 'don't use this drug, use this drug because we can get this drug through our program. But this one we can't [get] because the manufacturer or the assistance folks have our, they're onto us, and they won't let us process it' and they'll lose their margin, their 30 percent fee." ¶ 37.

- **Statement #6**: "Holcombe's final accusation specifically about Paydhealth implied that Paydhealth misleads healthcare plan clients about the savings Paydhealth can deliver. The statement noted that Paydhealth uses First Databank's reports of list prices as the benchmark for computing savings. 'I really thought First Databank was out of business.'" ¶ 38.

C.    **Immediate Reception**

Dr. Strollo expressed during his deposition that as Ms. Holcombe's presentation progressed, the attendees grew angry, "like it was a mob activity." ECF No. 96-2 at 87. He explained that "you could tell that everyone was just getting, like, more and more, like, unbelievable that that type of activity was occurring. And my—I guess what I was observing was the same feeling I had, was that this is very upsetting that this type of activity was going on." *Id.* Dr. Strollo did not speak to any of the attendees at the October 2, 2023 conference, nor has he "spoken to any of them since then." DSF ¶ 16.

D.    **Lawsuit**

Ms. Holcombe did not have contact with anyone from Paydhealth in the months immediately following the October 2023 conference. *See* ECF No. 96-6 at 216. This silence from Paydhealth broke on January 19, 2024, when Paydhealth filed its first Complaint against Ms. Holcombe before this Court, alleging one claim of defamation *per se*. DSF ¶ 5; *see also* ECF No. 1 at 12. In the initial Complaint, Paydhealth alleged that Ms. Holcombe made various false

6

statements regarding Paydhealth's operations and business model during the October 2, 2023 presentation. *See* PSF ¶ 15. Specifically, Plaintiff lodged the following allegations, *inter alia*: (a) "Paydhealth recognizes that the physician who prescribes a specialty drug for a plan participant has sole authority to determine which drug to prescribe," (b) "[u]sing the leading reporters of list prices for specialty drugs, First Databank, Inc. and MediSpan, clients can easily compute the Paydhealth fee it receives to provide advocacy services to a plan participant when a fee is based on the list price of a specialty drug," (c) "Paydhealth does not have a non-essential benefits list. The list Holcombe showed her audience was Paydhealth's Select Drugs and Products[SM] list," (d) "Paydhealth clients have discretion to include or exclude a particular drug on the program list. Paydhealth's compliance with the contracts does not disappoint clients or make them unhappy. In fact, it does the exact opposite . . . . ," (e) "Paydhealth provides no clinical services to plan participants, does not engage in therapeutic drug substitution, and does not control any plan's coverage policy or the selection and ranking of drugs on the plan's formulary," and (f) "First Databank has an active website, which states that it creates and delivers trusted drug databases." *Id.*; *see also* ECF No. 1 ¶¶ 20–21, 33–35, 37.

Ms. Holcombe was served with the Complaint on January 26, 2024. ECF No. 12. Immediately thereafter, she began reaching out to industry colleagues and family members regarding the suit, expressing "counterpoint[s] to [Paydhealth's] assertion[s]," "commentary" on the lawsuit, and—often—requests for support. *See, e.g.*, ECF No. 96-6 at 216–17, 219, 221, 223, 225–27, 229.

E.    **February 2024 Online Article**

In February 2024, Ms. Holcombe published an article titled "AFPs in 2024—A Hotspot for Concern and Action" in that month's issue of *Oncology Practice Management* ("February 2024

Article").  DSF ¶ 6; PSF ¶ 17.  In the February 2024 Article, Ms. Holcombe stated that "[s]ome known AFP vendors include ImpaxRx, PaydHealth, Payer Matrix, RxFree4me, SHARx, SavOnSP, and ScriptSourcing."  ECF No. 96-6 at 286–87.  The Article did not otherwise address Paydhealth directly.  *Id.*

Paydhealth asserts that Ms. Holcombe's February 2024 Article "republish[ed] her defamatory statements," *see* ECF No. 33 ("Am. Compl.") ¶ 41, in the following ways:

- **Statement #7**: "Holcombe again condemned AFPs, accused AFPs of various misconduct, and imputed that misconduct to Paydhealth by specifically identifying Paydhealth by name as a 'known AFP vendor[].'" ¶ 42.

- **Statement #8**: "Holcombe wrote, for instance, that AFPs (which, she claimed, included Paydhealth) 'convince the employer to simply eliminate or delay coverage for specific, or in some cases all, specialty drugs,' forcing employees to "enroll with the AFP in order for the AFP to bill the employer for claimed services or savings under the AFP model." Holcombe further asserted that the 'AFP suggests that they can find alternative pricing or sources for the needed drug (including foreign drug importation) or sometimes alternative drugs (tantamount to nonmedical switching)' and implied that AFPs keep physicians in the dark about this conduct.  She also made other claims of business misconduct, including that 'the AFP' pressures plan participants 'with very negative alternatives' and 'disrupts medical treatment' and that AFPs' business model 'make[s] no medical or ethical sense.'" ¶ 43.

*See supra* n.3.

### F.    **Alleged Harm to Plaintiff**

Paydhealth maintains that Ms. Holcombe's statements during the October 2023 Conference and in the February 2024 Article "caused actual injury to Paydhealth's reputation." Am. Compl. ¶ 47 ("Holcombe's publication of the defamatory statements, both at the Congress and in the February 2024 article, caused actual injury to Paydhealth's reputation by calling into doubt in the minds of her audiences Paydhealth's fitness for the conduct of its business.").  Per Plaintiff's Fourth Supplemental Response to Defendant's Second Set of Interrogatories, *see* ECF

No. 96-3 at 83, it is the Court's understanding that Paydhealth conveyed to Ms. Holcombe that it

suffered the below six major categories of reputational harm:[4]

- **AbbVie:** "Abbvie has sued Payer Matrix over some of the same conduct that Holcombe falsely accuses Paydhealth of engaging in. An Abbvie representative was present at Holcombe's presentation . . . and would therefore place Paydhealth into the same category as Payer Matrix." ECF No. 96-3 at 108–09.

- **Paydhealth's Chief Legal Officer**: "Even though [Mr. Franklin's] subsequent investigation demonstrated Holcombe was not telling the truth, Paydhealth's reputation has still been diminished in his eyes. He is no longer proud to tell people he is Paydhealth's Chief Legal Officer and disassociates himself from the business . . . ." *Id.* at 110. Further, "Paydhealth's Chief Legal Officer passed on a significant opportunity to introduce Paydhealth to a large group of potential clients because he was afraid Holcombe's misrepresentations would negatively taint some pro bono work," and "gave up on another opportunity to promote Paydhealth during a presentation he made at the 2025 VITAL conference on February 6, 2025." *Id.* at 110–11.

- **Carl Schmid of HIV + HEP Policy Institute**: "Carl Schmid of HIV + HEP Policy Institute (HIV + HEP) attended Holcombe's presentation about 'Alternative Funding Programs' at the 2022 Informa Connect Conference. He was clearly negatively influenced by her presentation . . . . Schmid was negatively influenced by Holcombe's [October 2023] presentation, and, indeed, moved to share the Powerpoint with NBC Universal's Jean Lee . . . . Schmid later was moved to prepare and send the correspondence" from HIV + HEP, which referenced Ms. Holcombe's work, to Congress. *Id.* at 111–12.

- **Paydhealth's Chief Operations Officer**: "Paydhealth's Chief Operations Officer . . . attended Holcombe's October 2, 2023 presentation at the 2023 Informa Connect Conference" and "observed a shift in the mood of the attendees from interest to hostility to a nearly mob mentality." *Id.* at 112–13. As a result of her statements, "[h]e did not want to be associated with Paydhealth given how Holcombe had turned the attendees against AFPs in general and Paydhealth in particular, and he therefore did not make any statement in defense of Paydhealth." *Id.* at 113–14. Further, Dr. Strollo observed that "Holcombe solicited from the audience ideas of what could be done to stop AFPs. One such response was 'Why doesn't somebody like Pfizer sue them?'" *Id.* at 114.

- **Paydhealth's Chief Commercial Officer**: "Holcombe's misrepresentations concerning Paydhealth switching plan participants to alternative drugs, Paydhealth importing medications, Paydhealth having a non-essential benefits list, and Paydhealth acting as a pharmacy and/or an unlicensed medical practicioner [sic] have foreclosed Paydhealth from entering into two critical markets that Paydhealth was created to service: doctors' offices and pharmaceutical companies / patient assistance programs

---

[4] The following are mere summaries of the harm alleged in Plaintiff's Fourth Supplemental Response to Defendant's Second Set of Interrogatories, *see* ECF No. 96-3 at 83, and do not completely reflect the information contained therein.

. . . . Until Holcombe's misrepresentations are corrected or adjudicated as false, Paydhealth is unable to enter these markets." *Id.* at 114–15.

- **Patient Assistance Program Eligibility**: "Shortly after Holcombe's presentation, the following patient assistance programs changed their enrollment forms to exclude all members in the Paydhealth program from signing up to receive assistance: Benlysta Gateway and Genentech-Access . . . . A representative of GlaxoSmithKline, which owns the Benlysta trademark, and funds the Benlysta Gateway program, attended Holcombe's presentation," as well as "[a] representative of Genentech." *Id.* at 115–18.

Paydhealth's alleged harm is discussed in further detail below, *infra* Section IV.C.

## II.    PROCEDURAL HISTORY

As described above, Paydhealth filed suit against Ms. Holcombe on January 19, 2024, alleging one claim of defamation *per se*.  ECF No. 1 at 12.  Following the grant of a 60-day extension to respond, *see* ECF No. 15, Ms. Holcombe filed a Motion to Dismiss for Failure to State a Claim on April 30, 2024.  ECF No. 23.  Briefing was complete as of June 5, 2024, and the Court granted the Motion to Dismiss for failure to adequately plead actual harm to Paydhealth's reputation on July 11, 2024.  *See* ECF Nos. 31, 32.

On August 12, 2024, Paydhealth filed its Amended Complaint against Ms. Holcombe, again alleging one claim of defamation *per se*.  *See* Am. Compl. at 13.  Ms. Holcombe moved soon thereafter to dismiss the Amended Complaint, *see* ECF No. 34, which the Court denied.  *See* ECF No. 37.  Discovery, including a quashed third-party subpoena to the law firm of Arnold & Porter, ensued.  *See* ECF Nos. 45, 78.

The parties filed their cross motions for summary judgment on May 6, 2025.  *See* ECF Nos. 93, 94.  In its partial summary judgment motion, Paydhealth requests that the Court find in its favor on the following grounds: (1) that Ms. Holcombe's "statements are capable of defamatory meaning *per se*"; (2) that Ms. Holcombe cannot show that her statements are true; (3) that Ms. Holcombe "acted with actual malice"; and (4) that "Paydhealth is not libel-proof."  *See* ECF No. 94 at 1.  Ms. Holcombe moves for complete summary judgment on the ground that Paydhealth has

failed to meet its burden of showing reputational harm.  *See* ECF No. 93 at 1.  The Court considers

Ms. Holcombe's motion first and will grant summary judgment in full in favor of Ms. Holcombe.

III.    **LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Indeed, "[s]ummary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017), *as amended* (Sept.

22, 2017) (internal quotations omitted) (quoting *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d

Cir. 2012)).  A fact is "material" if it "might affect the outcome of the suit under the governing

law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," there exists a genuine issue of

material fact.  *Id.*  It is incumbent upon the party moving for summary judgment to "inform[] the

district court of the basis for its motion, and identif[y] those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986) (cleaned up).

The party opposing summary judgment must demonstrate more than the "mere existence

of a scintilla of evidence" to defeat summary judgment.  *Anderson*, 477 U.S. at 252.  Likewise, "a

plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some

evidence that would show that there exists a genuine issue for trial," *Jones v. United Parcel Serv.*,

214 F.3d 402, 407 (3d Cir. 2000), as arguments made in the briefing "are not evidence and cannot

by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

To determine whether a genuine issue of material fact exists, the court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The ultimate question for the Court to decide is whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the court should grant summary judgment, as "there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

IV.    **DISCUSSION**

A.    **Defamation Under Pennsylvania Law**

The sole claim in the case is for defamation *per se*. *See* Am. Compl. at 13. In an action for defamation under Pennsylvania law, the Plaintiff maintains the burden of proving the defamatory character of the communication, publication by the defendant, its application to the plaintiff, the understanding by the recipient of its defamatory meaning, the understanding by the recipient of it as intended to be applied to the plaintiff, special harm resulting to the plaintiff from its publication, and abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. Ann. § 8343(a). "Defamation *per se* can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (cleaned up) (internal quotations omitted), *aff'd, Synygy, Inc. v. Scott-Levin*, 229 F.3d 1139 (3d Cir. 2000). A defendant's "statement is defamatory *per se* as an accusation of business misconduct if it ascribes to another conduct, characteristics or a condition

12

that would adversely affect his fitness for the proper conduct of his lawful business." *Id.* (cleaned up). Typically, the phrase "business misconduct refers to conduct that is illegal or connotes illegal activity." *Jungclaus v. Waverly Heights, Ltd.*, No. CV 17-4462, 2018 WL 1705961, at *4 (E.D. Pa. Apr. 9, 2018).

Notably, although the plaintiff bears the burden of showing that it suffered "[s]pecial harm resulting . . . from [the] publication" of the defendant's statements, 42 Pa. Cons. Stat. Ann. § 8343(a), when a statement "constitutes defamation *per se* . . . proof of 'special' damages is not required." *Rose v. Dowd*, 265 F. Supp. 3d 525, 531 (E.D. Pa. 2017) (citations omitted).[5] Indeed, when bringing a claim of defamation *per se*, plaintiff need plead only "general damages . . . which are proven upon a showing of 'actual harm.'" *Ralston v. Garabedian*, 623 F. Supp. 3d 544, 613 (E.D. Pa. 2022). Actual harm includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 429 (Pa. 2015).

Ms. Holcombe moves for summary judgment on the grounds that Paydhealth "lacks evidence of general damages, *i.e.*, harm to its reputation caused by the alleged defamatory statements at issue." ECF No. 93-1 at 5. In her Motion, Ms. Holcombe argues that the evidence set forth in Plaintiff's Fourth Supplemental Response to Defendant's Second Set of Interrogatories constitutes the universe of alleged harm in the case and addresses each alleged harm in turn. *Id.*; *see supra* Section I.F.

---

[5] Ms. Holcombe does not assert that Paydhealth need prove "special damages," nor does she appear to challenge in her own motion that each alleged defamatory statement is capable of defamatory meaning per se. Therefore, the Court will analyze the record evidence to determine only whether Paydhealth has established a genuine dispute of material fact as to general damages, that is, reputational harm.

In its Response, Paydhealth alleges that it need not show damages because Ms. Holcombe acted with actual malice, meaning that it is entitled to "presumed damages." ECF No. 97 at 9–11. In support of its assertion, Paydhealth raises two instances in which Ms. Holcombe's statements were made with actual malice: first, when she stated that she "really thought First Databank was out of business . . . I apologize if I'm wrong," and second, because Ms. Holcombe allegedly "repeated her October 2, 2023 defamatory statements in an article she published after being served with Paydhealth's Complaint." *Id.* Paydhealth further argues that, even if the Court does not find a material dispute of fact over whether Ms. Holcombe acted with actual malice, it still need only prove "evidence of harm to reputation or 'any other injury.'" *Id.* at 11. Paydhealth lists its purported reputational harm as: (1) the Gilead lawsuit, (2) observations and personal humiliation of its Chief Operations Officer, (3) the disassociation of its Chief Legal Officer, (4) the distress felt by its Chief Commercial Officer due to the inability to enter markets, (5) the records requests from Arnold & Porter and the AbbVie lawsuit, (6) the reaction of Carl Schmid and the HIV + HEP Letter to Congress, and (7) that GlaxoSmithKlein and Genentech changed their financial assistance program patient enrollment forms following Holcombe's presentation. *Id.* at 13–25.

Ms. Holcombe's reply briefing takes issue with Paydhealth's raising of the "actual malice" and "presumed damages" theory at the eleventh hour, argues that Paydhealth has failed to establish any evidence that Ms. Holcombe acted with actual malice, and explains how each argument Paydhealth raises in support of its theory of actual harm to reputation fails. *See generally* ECF No. 103.

The Court agrees that Paydhealth cannot now raise the issue of actual malice and presumed damages and, in addition, that Paydhealth has failed to show actual harm to reputation resulting from Ms. Holcombe's statements.

B.      **Paydhealth's "New" Presumed Damages Argument**

The Court must first analyze Ms. Holcombe's argument that Paydhealth cannot now raise its entitlement to presumed damages on the ground that "it has never raised, through pleading it or otherwise[,] that it need not prove reputational harm caused by Ms. Holcombe's statements because Ms. Holcombe supposedly made her statements with 'actual malice' and that it therefore can recover based only on presumed damages."  ECF No. 103 at 5.  Ms. Holcombe argues that raising the presumed damages argument at this late state is "impermissible" and would "unfairly prejudice[]" Ms. Holcombe's defense, as "a major focus of Ms. Holcombe's defense has been to demonstrate that Paydhealth has not proven, and cannot prove, that Paydhealth suffered any reputational harm caused by Ms. Holcombe's statements."  *Id.* at 5–6.

It appears that, for the first time in this action, Paydhealth is asserting that it is entitled to presumed damages—rather than general damages—because Dawn Holcombe acted with actual malice.  At the time of the initial filing of the Complaint, Paydhealth brought one claim of defamation *per se*.  *See* ECF No. 1 at 12.  In that claim for defamation *per se*, Paydhealth alleged that "Holcombe's publication of the defamatory statements caused **actual injury** to Paydhealth's **reputation**, and Paydhealth seeks recovery of **all damages resulting from that injury**."  *Id.* ¶ 39 (emphasis added).  Thereafter, at the motion to dismiss stage, the parties submitted their positions to the Court on the relevance of actual malice to the case in light of Paydhealth's potential classification as a limited purpose public figure.  *See* ECF No. 23-1 at 15 ("The complaint alleging defamation *per se* must be dismissed because there is no allegation that defendant acted with actual malice as required . . . for a case like this involving a public figure and a public controversy."); ECF No. 29 at 23 ("Holcombe has failed to carry her burden of showing that Paydhealth is a

limited purpose public figure. Paydhealth was not required to allege actual malice, and its pleading is more than sufficient.").

The Court, in relying on the allegations contained in the original complaint and the parties' arguments, granted Ms. Holcombe's motion and held that "[a]lthough Plaintiff is not a 'limited public figure' and need not plead allegations that could lead to an inference that Defendant acted with 'actual malice'—and, as a private figure who is bringing a defamation *per se* claim, need not plead facts that would support a finding of 'special harm'—Plaintiff still needs to plead allegations that would support a finding of general damages." ECF No. 31 at 10. The context within which the Court made its rulings cannot be ignored; it determined that Paydhealth need plead general damages—that is, harm to reputation—because Paydhealth *itself* brought a claim for defamation *per se* on the grounds that it suffered harm to its *reputation*.

Paydhealth reiterated its seeking of "actual damages" again in its Amended Complaint. *See* Am. Compl. at 1–2, 19. Indeed, since the Court's decision on the motion to dismiss, Paydhealth pursued a theory of "actual injury" with additional allegations relating to its *reputational* harm. *See, e.g.*, *id.* ¶ 47 ("Holcombe's publication of the defamatory statements, both at the Congress and in the February 2024 article, caused actual injury to Paydhealth's reputation by calling into doubt in the minds of her audiences Paydhealth's fitness for the conduct of its business."); *id.* ¶ 50 ("Holcombe herself concedes that her statements about AFPs damage the reputations of the companies she identifies as AFPs.").[6] And, in denying Ms. Holcombe's Motion to Dismiss the Amended Complaint, *see* ECF No. 34, the Court held that "Plaintiff's new allegations, taken as true, show that its **reputation** was **actually affected** by Defendant's alleged

---

[6] Even when referring to harm other than reputational harm, Paydhealth did not indicate that it was seeking presumed damages. Paydhealth alleged "pecuniary loss," "substantial costs to rehabilitate its reputation," and damage to its "value . . . as a going concern." Am. Compl. ¶¶ 53–55.

defamatory statements." ECF No. 37 at 1 (emphasis added). The parties, therefore, proceeded to discovery with harm to reputation as the framework for Paydhealth's case.

To now argue at the summary judgment stage that Paydhealth need not show actual harm because it is instead entitled to presumed damages is to flip the entire theory of the case on its head. This point is especially true given the circumstances: Ms. Holcombe's summary judgment briefing focuses entirely on Paydhealth's failure to show actual harm to reputation. *See generally* ECF No. 93. Had Ms. Holcombe been of the understanding that Paydhealth was proceeding under the theory of presumed damages, she likely would have made different summary judgment arguments. *Cf. Gryglak v. HSBC Bank USA, N.A.*, No. 217CV1514JCMNJK, 2022 WL 943602, at *6 (D. Nev. Mar. 29, 2022) ("Gryglak's violation thus burdened Wells Fargo with having to blindly respond to brand-new damages in the short deadlines to reply to her responses. This gamesmanship serves only to prevent summary judgment by keeping the record convoluted and preventing Wells Fargo from crafting arguments to potentially dispose of Gryglak's damages as a matter of law."), *aff'd sub nom. Gryglak v. HSBC Bank USA, N.A. as trustee for Wells Fargo Home Equity Asset-Backed Certificates, Series 2006-3*, No. 22-15630, 2023 WL 3243998 (9th Cir. May 4, 2023).

To the extent that Paydhealth makes the subversive argument in its Response that it in fact put Ms. Holcombe on notice that it would be pursuing a theory of actual malice and presumed damages, *see* ECF No. 97 at 9, this is merely a bait and switch when considered in light of the record, as described above. Ultimately, Plaintiff was free to move to amend its complaint to specify that it was seeking presumed damages on the ground that Ms. Holcombe was acting with actual malice. It did not. It cannot now seek to defeat summary judgment on the harm element of

its claim by alleging that it need not prove harm at all when it has continuously recognized its need to do so.

Accordingly, the Court will not analyze Paydhealth's argument that it need not show harm because it is entitled to presumed damages.[7]

C.    **Harm to Reputation**

The Court is therefore faced with the remaining issue of whether Paydheath has met its burden of showing a genuine dispute of material fact as to actual harm to reputation. After a review of the record, it finds that the evidence Paydhealth has set forth on summary judgment is insufficient for a reasonable trier of fact to find that Ms. Holcombe's statements harmed Paydhealth's reputation.

As described above, actual harm includes "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Joseph*, 129 A.3d at 429. "In determining if a plaintiff has demonstrated any loss to reputation, it must be measured by the perception of ***others***, rather than that of the plaintiff himself because reputation is the estimation in which one's character is held by his neighbors or associates." *Pennoyer v. Marriott Hotel Servs., Inc.*, 324 F. Supp. 2d 614, 619 (E.D. Pa. 2004) (internal citations and quotation omitted) (emphasis added). "[H]e or she must offer actual specific evidence of such general damages." *Beverly*

---

[7] As to whether Paydhealth's argument is barred by the law of the case doctrine, the Court disagrees. While it is true that the Court, in its decision on the Motion to Dismiss the Complaint, held that "Plaintiff does still need to plead 'general damages,' or that its 'reputation was actually affected by the slander," ECF No. 31 at 9–10, this decision alone did not necessarily foreclose the argument that Plaintiff is entitled to presumed damages. *See Mack v. Yost*, 63 F.4th 211, 231 (3d Cir. 2023) ("Usually, the law of the case doctrine dictates that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case . . . . But that doctrine does not prevent a court from deciding a summary judgment motion based on record evidence in a way that differs from previous decisions that were based on allegations in the complaint." (cleaned up)).

*Enters., Inc. v. Trump*, 182 F.3d 183, 188 n.2 (3d Cir. 1999).  To be sure, "[t]he plaintiff's testimony *may* alone show reputational harm; evidence of others in the community is not required." *Ralston v. Garabedian*, 623 F. Supp. 3d 544, 606 (E.D. Pa. 2022) (cleaned up) (emphasis added). However, "the plaintiff's testimony regarding reputational harm must bear on the perception of others, rather than that of the plaintiff." *Id.* (cleaned up).

"Critically, for purposes of a Pennsylvania defamation case, proof of actual injury to a private plaintiff's reputation is a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries." *Weiser L. Firm, P.C. v. Hartleib*, 665 F. Supp. 3d 647, 669 (E.D. Pa. 2023) (quoting *Joseph*, 129 A.3d at 429) (cleaned up); *see also Ralston*, 623 F. Supp. 3d at 597–98 ("The Pennsylvania Supreme Court concluded a private-figure defamation plaintiff who does not prove actual malice must prove actual injury to his reputation as a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries . . . . Permitting the recovery of damages for injuries such as mental anguish without a showing of injury to reputation subverts the United States Supreme Court's defamation framework because protection of an individual's reputation is the very essence of a claim for defamation.  These findings abrogated the Pennsylvania Superior Court's previous findings in the same case [that] a defamation plaintiff only needed to prove reputational harm *or* personal humiliation to recover damages." (cleaned up)).

Further embedded in the requirement that a plaintiff show harm is the need for plaintiff to carry its burden to "establish a causal connection between the negligently published falsehood and the actual injuries which they have suffered." *Joseph*, 129 A.3d at 429.  "The burden of proving causation is on the private figure plaintiff, and that burden must be sustained by a preponderance of the evidence." *Id.*  While the question of "[w]hether . . . that standard has been met with respect

to the element of causation is normally a question of fact," *id.*, "the question is to be removed from the jury's consideration . . . where it is clear that reasonable minds could not differ on the issue," *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1978).

The Court will adopt Paydhealth's list of categories of harm from its response to Ms. Holcombe's Motion, which includes (1) the Gilead lawsuit, (2) observations and personal humiliation of its Chief Operations Officer, (3) the disassociation of its Chief Legal Officer, (4) the distress felt by its Chief Commercial Officer due to the inability to enter markets, (5) the records requests from Arnold & Porter and the AbbVie lawsuit, (6) the reaction of Carl Schmid, and (7) that GlaxoSmithKlein and Genentech changed their financial assistance program patient enrollment forms following Ms. Holcombe's presentation. *See generally* ECF No. 97. The Court will address each alleged harm in turn.

1.    ***The Gilead Lawsuit***

Paydhealth argues that "Gilead Sciences, Inc. and Gilead Sciences Ireland UC filed a lawsuit and obtained a TRO against" another entity "based on the same type of conduct Holcombe has falsely accused Paydhealth of engaging in," thereby "expos[ing] Paydhealth to the same risk." *Id.* at 13. Paydhealth asserted that this "risk manifested itself shortly after Holcombe published her article asserting that Paydhealth illegally imported drugs when Gilead served Paydhealth with a subpoena," citing to Mr. Franklin's testimony that the two occurred "awful close together in proximity to seem to be—they don't seem to be coincidences. They seem to be causal." *Id.* Paydhealth then explained that "no need exists to depose Gilead on this issue because the world at large knows as a matter of public record that Gilead detests illegal importation enough to file a lawsuit against an entity it believes is doing so." *Id.* at 14. In response, Ms. Holcombe asserts that

"Paydhealth has produced zero admissible evidence that there is any causal connection between the issuing of the subpoena and the alleged defamatory statements."  ECF No. 103 at 11.

Ultimately, Plaintiff offers no more than Mr. Franklin's speculation on the timing between the February 2024 article and the subpoena, which Paydhealth received "not long after" the article was published.  *See* ECF No. 96-2 at 156 ("And Dawn Holcombe publishes an article that we're importing . . .  And not long after that, we get a subpoena from Gilead asking if we're importing.  And so [the] two are awful close together in proximity to seem to be — they don't seem to be coincidences.  They seem to be causal . . . .  She says it, we get something from Gilead."); *id.* ("Again, she was the catalyst.  She ignited the fuse so other people, obviously, started repeating some of those allegations . . . .  We got the Gilead subpoena, repeating her allegation that we're importing drugs illegally, so, yeah. The damage continues.").  "While all reasonable inferences must be drawn in favor of the nonmoving party, an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment."  *In re Asbestos Prods. Liab. Litig. (No. VI)*, 837 F.3d 231, 235 (3d Cir. 2016).

Simply put, Paydhealth offers no evidence that anyone associated with Gilead accessed the article, much less that Ms. Holcombe's article had any impact on the issuance of the subpoena.  Paydhealth offers no witness testimony from any Gilead representative regarding the subpoena, and its reasons for not doing so are of no moment.  Without more, the Court finds that Paydhealth has not met its burden of showing a genuine dispute of material fact as to reputational harm on this basis.

2.    ***Observations and Personal Humiliation of Paydhealth's Chief Operations Officer***

Paydhealth argues that Dr. Strollo's personal observations of the audience at the October 2023 Conference indicate that Ms. Holcombe's statements caused Paydhealth reputational harm.

21

According to Dr. Strollo, while attending the Conference, he observed the crowd's emotion go from "interested" to "more and more . . . unbelievable that that type of activity was occurring," culminating in "a mob activity" in "the second half of the presentation."  ECF No. 96-2 at 87. "The more she was telling, like, the bad things," Dr. Strollo testified, "the more worked up the group was and the more they would provide more examples of, you know, that's terrible, you know, or we should sue the alternate funding program was a comment that was made.  We should get Pfizer to sue them or something.  And it was just more and more.  I could read the room.  You could tell that everyone was getting more animated, more intent, like, you know, let's burn the house down type." *Id.* at 88.  Dr. Strollo also purportedly experienced personal humiliation when attending the October 2023 Conference.  *See, e.g.*, *id.* at 136 ("And there's one other problem, which is that this is happening with one of the founders of our company sitting there being so humiliated that he did not want to speak up on behalf of the company.  So it was an impactful presentation from Ms. Holcombe's standpoint.").

The Court does not find that Dr. Strollo's personal observations, without more, create a genuine dispute of material fact on the issue of harm.  Even if Dr. Strollo did witness a change in the emotions of the audience members to "mob activity," Paydhealth has failed to offer *any* additional evidence that the audience members' perceptions of Paydhealth actually changed during or following the October 2023 Conference, nor that Ms. Holcombe's statements about *Paydhealth specifically* caused any such change.  Indeed, Dr. Strollo admitted during his deposition that he did not speak to any attendees on October 2, 2023, nor did he contact the attendees after the Conference concluded.  *See id.* at 77.  None of the conference attendees were deposed.

The Court ultimately finds that Dr. Strollo's observations amount to pure speculation as to the mental state of the audience members and do not create a genuine dispute of material fact as

to any harm to Paydhealth's reputation.  While "[t]he plaintiff's testimony may alone show reputational harm," *Ralston*, 623 F. Supp. 3d at 606, the issue of harm cannot proceed to a jury on a Paydhealth employee's unsupported perception of strangers' emotions.  Indeed, there is no evidence that Dr. Strollo had any follow up conversations or even overheard a conversation—no matter how fleeting—in which Paydhealth's reputation was addressed.  In addition, because Paydhealth has failed to show reputational harm, any mental harm that Dr. Strollo experienced is not enough to create triable issue for the jury as to actual harm.  *See Durando v. Trs. of Univ. of Pa.*, No. CV 21-756, 2022 WL 2192943, at *6 (E.D. Pa. June 17, 2022) ("Plaintiff must point to record evidence of *actual* reputational injury.  Without it, Plaintiff's evidence of humiliation and mental anguish and suffering is irrelevant, because such injuries cannot alone establish the special harm element of a defamation claim in Pennsylvania." (cleaned up) (emphasis in original)).

Therefore, Paydhealth has failed to establish a genuine dispute of material fact as to reputational harm on this basis.

### 3. *The Disassociation of its Chief Legal Officer*

Paydhealth next argues that it has suffered harm in the form of the changing attitude of its own Chief Legal Officer, Mr. Franklin, toward Paydhealth and its business.  Mr. Franklin is purportedly "no longer proud to tell people he is Paydhealth's [Chief Legal Officer] and disassociates himself from the business telling people who ask what he does 'I'm just an attorney' in a voice that indicates they are likely to be very bored if they ask any additional questions."  ECF No. 97 at 15–19.  Paydhealth further contends that Mr. Franklin has turned down a business opportunity for Paydhealth because he was concerned about the impact of Ms. Holcombe's statements on the potential customers he'd be pitching to and has refrained from promoting

Paydhealth during his engagements. *Id*. In other words, Mr. Franklin seeks to "disassociate" himself "from Paydhealth" as a result of Ms. Holcombe's statements. *See* ECF No. 96-2 at 146.

In response, Ms. Holcombe contends that "any loss to reputation . . . must be measured by the perception of others, rather than that of the plaintiff because reputation is the estimation in which one's character is held by his neighbors or associates." ECF No. 93-1 at 25. According to Ms. Holcombe, permitting Paydhealth to establish a genuine dispute of material fact as to harm based on its own perceptions (elicited through Mr. Franklin's testimony) "would turn this principle on its head." *Id*. In response, Paydhealth asserts that "[u]nder the law of corporations, a corporation is distinct from its employees," and that "[i]f employees disassociate themselves from Paydhealth because of defamatory statements, whether or not they believe them, that is damage to reputation." ECF No. 97 at 15 (citing *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 971 (3d Cir. 1985)).

The Court agrees with Ms. Holcombe. While Paydhealth alleges that Mr. Franklin seeks to "disassociate" himself from the entity as a result of Ms. Holcombe's statements, the standard for actual harm to reputation looks to whether the statements "lower[ed] [the plaintiff's] standing in the community or deter[ed] **third parties** from associating or dealing with" the plaintiff. *Schabacker v. Ferens*, No. CV 22-3778, 2024 WL 710632, at *4 (E.D. Pa. Feb. 21, 2024) (emphasis added). There is no way to spin it—Mr. Franklin is not a third party under the circumstances. He has not quit his job with Paydhealth, nor has he *actually* disassociated himself from Paydhealth. Paydhealth's argument, therefore, is a personal humiliation argument in disguise. And, because Paydhealth has failed to show actual harm to its reputation, it cannot move forward on personal humiliation alone.

Again, there is no record evidence that Mr. Franklin, or anyone else from Paydhealth, received any pushback from anyone in any attempt to promote or market the Company, whether

by direct sale or conference engagements or presentations.  Accordingly, the Court finds that Paydhealth has failed to meet its burden of showing a genuine dispute of material fact as to reputational harm on this basis.

### 4.    *The Distress of the Chief Commercial Officer*

Paydhealth next argues that Dr. Galardi's testimony that Paydhealth cannot expand its business because Dr. Galardi does "not feel comfortable talking to colleagues in the pharmaceutical side of the house with them believing that we act as criminals" constitutes reputational harm.  ECF No. 96-2 at 244.  Dr. Galardi went on to testify that "I just — until — until we can categorically state that we're — we're not doing this and that we have essentially rebuffed the allegations that came through in not only the presentation, but the subsequent article after the suit had been filed, I mean that makes it very difficult."  *Id.*  However, Dr. Galardi himself testified that he has not "talked to anyone in Pharma about the statements that were made by Dawn Holcombe either on October 2nd . . . or thereafter or at any time" because he has "gone under a rock for this side.  You know, I just don't feel comfortable doing it."  *Id.* at 245.

In other words, Dr. Galardi is basing his business decisions regarding Paydhealth's expansion on pure speculation after refusing to discuss those statements with third parties in the pharmaceutical industry.  Dr. Galardi does not actually know whether Ms. Holcombe's statements "lower[ed] [Paydhealth's] standing in the community or deter[ed] third parties from associating or dealing with" Paydhealth.  *Schabacker*, 2024 WL 710632, at *4.  Without more, the Court again finds that Paydhealth has failed to meet its burden of showing a genuine dispute of material fact as to reputational harm on this basis.

5.    ***Arnold & Porter Records Requests and the AbbVie Lawsuit***

Paydhealth next contends that Arnold & Porter began sending open records requests to Paydhealth's customers due to Ms. Holcombe's statements at the October 2023 Conference.  *See, e.g.*, ECF No. 97 at 20–22.  Ms. Holcombe asserts that there is a sworn declaration in the record from Arnold & Porter partner Valarie Hayes—the lead partner on the legal team which submitted the public records requests—dispelling the notion that she or her colleagues "attended the Conference on October 2, 2023, communicated with Ms. Holcombe about the Conference, or ever heard anything about the Conference or Ms. Holcombe's alleged statements prior to Paydhealth's filing this lawsuit."  *See* DSF ¶ 23.  According to Ms. Holcombe, Paydhealth "lacks any evidence that the firm or its client developed a negative view of Plaintiff at all, much less that any such view resulted from [Ms. Holcombe's] statements."  ECF No. 93-1 at 24.

In response, Paydhealth argues that "the Records Request came less than a month after" the October 2, 2023 presentation, and that "[t]he most likely scenario" is that "AbbVie . . . simply [told] Arnold & Porter to look into whether Paydhealth is switching to alternative drugs, without any attribution of source."  ECF No. 97 at 21.  Paydhealth further asserts that this Court "was misled by a vague and misleading declaration," and that "[n]o need exists to depose AbbVie because we already know that AbbVie detests entities it believes switch plan participants to alternative drugs enough to sue one."  *Id.* at 21–22.

As Paydhealth recognizes, this issue was all but previously decided during discovery, when Paydhealth attempted to subpoena third-party Arnold & Porter for records relating to Paydhealth.  *See* ECF No. 54.  Arnold & Porter submitted a sworn declaration to the Court confirming that "Arnold & Porter has no records in its possession that are related to Ms. Holcombe's alleged statements at the Conference and created between October 2, 2023 (the date of Holcombe's

presentation) and October 20, 2023 (the date of Arnold & Porter's first public records requests seeking information about Paydhealth) or even between October 20, 2023 and the date Paydhealth filed this lawsuit in January 2024." ECF No. 54-2 at 3–4. Plaintiff's assertion that the Court "was misled by a vague and misleading declaration," ECF No. 97 at 21, is entirely unsupported, and the declaration remains unrebutted.

The Court finds that Paydhealth has failed to meet its burden of showing a genuine dispute of material fact as to reputational harm on this basis.

### 6. *Carl Schmid*

Paydhealth contends that Ms. Holcombe's statements caused Mr. Schmid of the HIV + HEP Policy Institute to submit a letter to Congress openly criticizing AFPs, including Paydhealth. *See* ECF No. 97 at 22. Ms. Holcombe argues that "Plaintiff lacks evidence that [Mr. Schmid] developed a negative view of Plaintiff caused by any statements of Defendant on or after October 2, 2023, the date of the first alleged defamatory statements." ECF No. 93-1 at 24. In response to Ms. Holcombe's argument, Paydhealth asserts that Ms. Holcombe's 2023 presentation "inspired Schmid to ask Congress to ban Paydhealth and cite Holcombe's defamatory presentation while doing so." ECF No. 97 at 23. It further dispelled any need to depose Mr. Schmid, citing the notion that "Schmid is plainly willing to alter facts in order to protect Holcombe's credibility . . . [so] [w]hy would Paydhealth bother to depose a person pledged to Paydhealth's destruction"? *Id.* at 22.

While the record is clear on the fact that Mr. Schmid referred to Ms. Holcombe's October 2023 presentation in the HIV + HEP Policy Institute letter to Congress, *see* ECF No. 96-6 at 276, Paydhealth has failed to adduce any evidence that Mr. Schmid penned the letter *because of* Ms. Holcombe's statements at the October 2023 Conference or in the February 2024 Article rather than

merely just *citing* to her work.  Indeed, Paydhealth itself recognized in its Fourth Supplemental Response to Defendant's Second Set of Interrogatories that Mr. Schmid indeed held a negative view of AFPs well before the statements at issue in this litigation came into being—namely, because of a 2022 presentation by Ms. Holcombe not at issue in the instant litigation.  *See* ECF No. 96-3 at 111–12.  In other words, Paydhealth has not met its burden to show any evidence that the precise statements at issue caused the submission of the HIV + HEP letter to Congress, rather than Mr. Schmid's general negative perception of AFPs and familiarity with Ms. Holcombe's work.  It can only speculate.  *See, e.g.*, ECF No. 96-2 at 146 ("I'm aware of the fact that Ms. Holcombe, very soon after the presentation, sent yet another e-mail to Mr. Carl Schmid . . . of HIV+HEP Policy Institute, which she sent her slide deck to him, which he subsequently used.  So that had an impact on him as did the prior conference presentation that we didn't know about, part of the lawsuit.  But that inspired him to write Congress and ask that our company be banned . . . . .  Q. Have you ever spoken to Mr. Schmid?  A. No, I have not.").

Accordingly, the Court finds that Paydhealth has failed to establish a genuine dispute of material fact as to reputational harm on this basis.[8]

### 7.    *Changing Enrollment Forms*

Paydhealth next contends that GlaxoSmithKline and Genentech, two pharmaceutical companies, changed their enrollment forms following the October 2023 Conference to exclude patients working with Paydhealth, further indicating harm to the Company's reputation.  ECF No. 97 at 23–25.  Ms. Holcombe argues that Paydhealth "admits that it has no witness who can testify

---

[8] Further, Paydhealth's accusation that, if deposed, Mr. Schmid would *lie* when giving sworn testimony about his "inspiration" for writing the letter is a red herring meant only to distract from the fact that Paydhealth presented no evidence establishing a causal connection between the letter and the statements at issue.

that either PAP changed their form because of Defendant's statements at issue and that the evidence that they allegedly did so is based on the timing of the changes in relation to Defendant's October 2023 statements."  ECF No. 93-1 at 15–16.  In response, Paydhealth argues that "both companies changed their financial assistance program patient enrollment forms after corporate representatives attended Holcombe's presentation," and that deposing representatives of these companies to confirm this connection "would be detrimental to Paydhealth's ability to return to their good graces."  ECF No. 97 at 24.

The Court does not find that Paydhealth has established a genuine dispute of material fact as to harm under these circumstances.  Once again, Paydhealth offers mere speculation that, because representatives of these entities attended Ms. Holcombe's presentation and subsequently changed their enrollment forms to exclude Paydhealth, the change *must* have resulted from Ms. Holcombe's statements.  *See, e.g.*, ECF No. 96-2 at 213 ("Q: You — you — from your comments I also gather that you believe that the Genentech change in policy to exclude Paydhealth was as a result of what Ms. Holcombe said?  A. Well, if — if — if I may, I think there's a strong inference. The timing was very, very close to, you know, shortly thereafter her presentation, uhm, so I think there's a good inference."); *id.* at 67 ("Q. Do you have any evidence that they were changed because of something that Dawn Holcombe said, other than your observations about the timing of these documents?  A. Well, I know who was at the conference.  I know that the forms were — did not have any exclusions prior to the conference, and I know that people who attended the conference were affiliated with these forms, and they've changed after presentation."); *id.* at 68 ("Q. Other than your review of the timing of these documents or your views on the timing of those documents and your understanding that people from these companies were at the conference, do you have any other evidence to suggest that forms were changed because of what Dawn Holcombe

said as opposed to, for example, being referred to as a fraud and a scam by Adam Fein?  A. I don't. I don't have anything additional about that, but it's the timing of the — you know, cause and effect, you know.").

While the Court is obligated to make all reasonable inferences in Paydhealth's favor, it will not find that a genuine dispute of material fact exists based on musings of an employee as to temporal proximity without any additional evidence.  Accordingly, the Court finds that Paydhealth has failed to establish a genuine dispute of material fact as to reputational harm on this basis.

\* \* \*

The Court finds that Paydhealth has failed to establish a genuine dispute of material fact as to the reputational harm it sustained from Ms. Holcombe's alleged statements.  Ms. Holcombe's motion for summary judgment is therefore **GRANTED** in full, and the claim for defamation *per se* dismissed with prejudice.

V.    **CONCLUSION**

For the reasons stated above, Ms. Holcombe's Motion (ECF No. 93) is **GRANTED,** and Plaintiff's Motions (ECF Nos. 92, 94) are **DENIED as moot**.  An appropriate order will follow.

**BY THE COURT:**

**/s/ CHAD F. KENNEY**

_____

**CHAD F. KENNEY, J.**